IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JAMES MESHACH LOMAX, # 280-316    *
         Plaintiff,
     v.                   *    CIVIL ACTION NO. DKC-14-2180

COLIN OTTEY, M.D.           *
GREG FLURY, P.A.
FRANK BISHOP, WARDEN     *
BOBBY P. SHEARIN, FORMER WARDEN
R. RODERICK, CASE MANAGEMENT   *
  MANAGER
             Defendants.    *

*****

## MEMORANDUM OPINION

Self-represented inmate James Meshach Lomax ("Lomax") filed a Complaint pursuant to 42 U.S.C. § 1983. ECF No. 1. Defendants Bishop, Shearin and Roderick ("State Defendants"), by their counsel, have filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment with administrative remedy procedure ("ARP") exhibits and Declarations. ECF No. 33. Lomax has filed an Opposition response. ECF No. 41.[1] Defendants Flury and Ottey ("Medical Defendants") have filed a court-ordered Motion for Summary Judgment (ECF No. 47) to which Lomax has filed an Opposition (ECF No. 50) and the Medical Defendants have filed a Reply. ECF No. 52. A hearing is not needed to resolve the issues. *See* Local Rule 106.5 (D. Md. 2014). For reasons to follow, Defendants' Motions for Summary Judgment ARE GRANTED and judgment will be entered in their favor.

---

[1] Lomax's earlier November 20, 2014 Response is an Opposition to Defendants Flury and Ottey's ("Medical Defendants") initial Motion to Dismiss. *See* ECF Nos. 36. The Clerk, however, inadvertently entered it on the docket as Lomax's opposition to the State Defendants' dispositive motion. The court denied the Medical Defendants' Motion to Dismiss on December 16, 2014. ECF No. 40.

**BACKGROUND**

**Plaintiff's Allegations**

In his Complaint, Lomax, an inmate housed at the North Branch Correctional Institution ("NBCI") in Cumberland, Maryland, claimed that on August 16, 2013, he was in a physical altercation with a cell mate, who was receiving an antibiotic for a mouth infection.[2]  He claims that the altercation resulted in severe injury to his left hand, in that the cell mate "split my hand open over top of my index and middle finger."  ECF No. 1.   Lomax alleges that in the following day his hand swelled to "more than three times its natural size and was becoming infected."  He asserts that within a week, he was seen by Physician's Assistant Greg Flury and an unknown male nurse.  *Id.*

Lomax asserts that he received x-rays at the Western Correctional Institution ("WCI"), but that upon his return to NBCI he was not immediately provided any promised pain medication, antibiotics, or dressing changes.  He states that it was not until eight days after the altercation, August 24, 2013, that he was given the promised care.  Lomax claims that he suffered headaches, fever, cold sweats, vomiting and diarrhea.  He further alleges that he saw Flury on August 28, 2013, and the PA refused to investigate his assailant's medical records.  Lomax asserts that Flury "attempted to squeeze the infection out of his hand," but could not do so because Lomax could not bend his index and middle fingers.  ECF No. 1.  He complains that Flury did not inform him of the seriousness of his hand injury and did not send him to the hospital to "test the infection in my hand" and/or to have his hand surgically repaired.  *Id.*

---

[2]     Lomax states that his cellmate, who had been taking penicillin for an infection in his mouth, bit him.  ECF No. 1.

Lomax's Complaint provides a chronological listing of his ARP complaints filed against Flury[3] as to the PA's failure properly to treat his hand abscess[4] and "leaking lime green infection." He alleges that rather than sending him out to a hospital, Flury prescribed him a stronger antibiotic without any pain relief medicine. Lomax states that in October of 2013 he saw Dr. Ottey, who ordered x-rays of his hand. *Id.* He contends that the radiologist informed him that his hand had "some kind of blockage." Lomax claims that Ottey informed him that his x-rays were negative and the doctor repeatedly indicated he would be seen by an orthopedic surgeon, but this did not occur. He asserts that when he received copies of his medical records in April of 2014, it was proven that six months earlier Ottey knew he needed an MRI or to be seen by an orthopedic surgeon. *Id.*

## STANDARD OF REVIEW

This court reviews the facts and all reasonable inferences in the light most favorable to the nonmoving party. *See Scott v. Harris,* 550 U.S. 372, 378 (2007); *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Such review liberally construes Lomax's pleadings in light of the fact that he is self-represented. *See Gordon v. Leek*, 574 F.2d 1147, 1151 (4th Cir. 1978).

The purpose of a Rule 12(b)(6) motion [to dismiss] is to test the sufficiency of a complaint. *See Burney v. Cuccinelli,* 616 F.3d 393, 408 (4th Cir. 2010). A Rule 12(b)(6) motion

---

[3] Lomax asserts that he asked the Warden to intervene so as to order medical staff to have him hospitalized for his injury because the infection was causing abscesses or "sissies" (cysts) on top of the hand wound. He complains that Case Management Manager Roderick dismissed his ARP complaint as frivolous and that later ARPs were dismissed as repetitive or as previously resolved. ECF No. 1, Exs. A-K.

[4] An abscess is a simple collection of necrotic tissue in a liquefied status; most often infected (with purulent material or pus). Apart from the local symptoms of pain, swelling, redness and limitations of movements due to the location, systemic symptoms like fever are not uncommon. The best treatment for any abscess or collection of pus is to drain it with a liberal incision. *See* http://www.medindia.net/education/familymedicine/incision-drainage-abscess-procedures.htm.

constitutes an assertion by the defendant that, even if the facts that plaintiff alleges are true, the complaint fails, as a matter of law, "to state a claim upon which relief can be granted." Fed R. Civ. P. 12(b)(6). Therefore, in considering a motion to dismiss under Rule 12(b)(6), a court must "accept[ ] as true the well-pled facts in the complaint and view[ ] them in the light most favorable to the plaintiff." *Brockington v. Boykins,* 637 F.3d 503, 505 (4th Cir. 2011) (citation omitted).

Ordinarily, a court cannot consider matters outside the pleadings or resolve factual disputes when ruling on a Rule 12(b)(6) motion. *See Bosiger v. U.S. Airways,* 510 F.3d 442, 450 (4th Cir. 2007). If the court does consider matters outside the pleadings, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed.R.Civ.P. 12(d); *see also Finley Lines Joint Protective Bd. Unit 200 v. Norfolk S. Corp.,* 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."). This court deems it appropriate to consider the extraneous materials, as they are likely to facilitate disposition of this case. Accordingly, the State Defendants' Motion shall be treated as a motion for summary judgment.

Rule 56(a) of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By

its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to…the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 645 (4th Cir. 2002). At the same time, the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat,* 346 F.3d at 526 (quoting *Drewitt v. Pratt,* 999 F.2d 774, 778–79 (4th Cir.1993)) (internal quotation marks omitted) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24 (1986)). The court must view the evidence in the light most favorable to the nonmovant and draw all justifiable inferences in his favor. S*ee Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore,* 721 F.3d 264, 283 (4th Cir. 2013) (citation omitted). At the same time, the court must not yield its obligation "to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (citation and internal quotation marks omitted). This case shall be analyzed in light of this standard of review.

A federal court must liberally construe pleadings filed by pro se litigants to allow them to fully develop potentially meritorious cases. *See Erickson v. Pardus,* 551 U.S. at 89, 94 (2007); *Cruz v. Beto*, 405 U.S. 319 (1972). The requirement of liberal construction does not mean the court can ignore a clear failure in the pleadings to allege facts which set forth a claim, *see Weller v. Department of Social Services,* 901 F.2d 387, 391 (4th Cir. 1990), or assume the existence of a genuine issue of material fact where none exists. Fed. R. Civ. P. 56(c).

## ANALYSIS

Title 42 U.S.C. § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)). A suit under § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, 707 (1999). To state a claim under § 1983, a plaintiff must allege that (1) a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

### Defendants Ottey and Flury (Medical Defendants)

With regard to the claims raised against Defendants Ottey and Flury, the Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) citing *Wilson v. Seiter*, 501 U.S.294, 297 (1991). In order to state an Eighth Amendment claim

for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to his serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed either to provide it or to ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

As noted above, objectively, the medical condition at issue must be serious.[5] *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *Farmer*, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that

---

[5]     A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241, citing to *Henderson v. Sheahan,* 196 F.3d 839, 846 (7th Cir. 1999). Courts in this Circuit have recognized a wide range of medical conditions as serious. *See Howard v. Smith,* 87 Fed. Appx. 309, 310 (4th Cir .2004) (finding a broken or dislodged bone could be a serious medical condition). Numerous courts have found objectively serious injury in cases involving injury to the hand, including broken bones. *See,* e.g., *Lepper v. Nguyen,* 368 Fed. Appx. 35, 39 (11th Cir. 2010); *Andrews v. Hanks,* 50 Fed. Appx. 766, 769 (7th Cir. 2002); *Bryan v. Endell,* 141 F.3d 1290, 1291 (8th Cir. 1998) *Beaman v. Unger,* 838 F.Supp.2d 108, 110 (W.D. N.Y. 2011); *Thompson v. Shutt,* 2010 WL 4366107 at *4 (E.D. Cal. Oct. 27, 2010); *Mantigal v. Cate,* 2010 WL 3365735 at *6 (C.D. Cal. May 24, 2010) *report and recommendation adopted,* 2010 WL 3365383 (C.D. Cal. Aug.24, 2010); *Johnson v. Adams,* 2010 WL 1407787 at *4 (E.D. Ark. Mar.8, 2010) report and recommendation adopted, 2010 WL 1407790 (E.D. Ark. Mar.31, 2010); *Bragg v. Tyler,* 2007 WL 2915098 at *5 (D. N.J. Oct.4, 2007); *Vining v. Department of Correction,* 2013 U.S. Dist. LEXIS 136195 at *13, 2013 WL 2036325 (S.D. N.Y. 2013)(chronic pain arising from serious hand injuries satisfies the objective prong of Eighth Amendment deliberate indifference analysis). A three-day delay in providing medical treatment for an inmate's broken hand was a serious medical need. *Cokely v. Townley,* 1991 U.S.App. LEXIS 1931 (4th Cir. 1991).

risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter…becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995), quoting *Farmer,* 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown*, 240 F. 3d at 390; citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken). Inmates do not have a constitutional right to the treatment of their choice, *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986), and disagreements between medical staff and an inmate over the necessity for or extent of medical treatment do not rise to a constitutional injury. *See Estelle*, 429 U.S. at 105-06; *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *see also Fleming v. LeFevere*, 423 F.Supp.2d 1064, 1070-71 (C.D. Cal. 2006).

The Medical Defendants state that Lomax was in a physical altercation with another inmate at NBCI, which resulted in his injuring his left hand. They maintain that he received medical care from Defendants Flury, Ottey and other healthcare providers and that his claims, at most, sound in medical negligence, which requires compliance with the Healthcare Malpractice statute in order to maintain a cause of action. ECF No. 47. They also maintain a qualified immunity defense.

The medical record shows that Lomax placed his initial sick-call request on August 20, 2013, four days after his initial injury.  On August 22, 2013, Lomax was seen by Flury, who examined his hand and ordered an x-ray.  The x-ray showed no evidence of acute fracture, dislocation, subluxation, or disease.  In addition to ordering the x-ray, Flury ordered prescriptions for Ibuprofen, Clindamycin HCL,[6] and Rocephin.  Flury and Ottey claim that Lomax received a Rocephin shot[7] on August 22, 2013, and was provided with wound care.  They maintain that notwithstanding Lomax's protestations to the contrary, he was provided with daily wound care until his laceration healed and such care was no longer required.  ECF No. 47-A, pgs. 30-32, 34-46, 50 & 53-56.

When he arrived in the medical room for his August 23, 2013 wound care, Lomax's hand was unwrapped. The following day, he was given an additional Rocephin shot, along with supplies for wound care.  On August 25, 2013, Nurse Durst noted that Lomax had finished his Rocephin injections the previous day, but continued to receive Clindamycin for his infection. Flury and Ottey argue that Lomax continued to receive daily wound care from August 26, 2013 through September 4, 2013.  On August 28, 2013, Flury noted that he attempted to express drainage from Lomax's wound, but could not do so because Lomax was unable to tolerate the treatment.  ECF No. 47-A, pgs. 59-69.  Approximately one week later Flury saw Lomax, who refused to allow Flury to perform an incision and drainage ("I & D") or allow the PA to express

---

[6]     Clindamycin HCL is used to reduce the development of drug-resistant bacteria and to maintain the effectiveness of other antibacterial drugs.  It should be used only to treat or prevent infections that are proven or strongly suspected to be caused by bacteria.  *See* http://www.rxlist.com/clindamycin-drug.htm.

[7]     Rocephin (ceftriaxone sodium) for Injection is a cephalosporin antibiotic used to treat many kinds of bacterial infections, including severe or life-threatening forms such as meningitis.  *See* http://www.rxlist.com/rocephin-side-effects-drug-center.htm.

fluid from the wound.  Flury noted Lomax's refusal and "educated" him that allowing the prurient material to remain in the wound would prolong the infection, symptoms, and impact outcome.  The Medical Defendants opine that Lomax's refusal likely contributed to his limited use of the finger.  ECF No. 47-C, Ottey Aff.  On September 5, 2013, Lomax indicated that his symptoms had improved while he was on antibiotics, but had worsened once the antibiotics had been discontinued.  Flury prescribed additional antibiotics to treat his infection and Lomax was given Ciprofloxacin[8] and Clindamycin the following date.  ECF No. 47-A, pgs. 70-85.

Lomax's wound care continued and on September 9, 2013, he indicated that he had supplies in his cell and did not need his bandage changed.  On September 12, 2013, Lomax refused to allow Flury to examine his second and third left hand digits due to pain.  He was transferred out of NBCI for the next eight days and did not receive care from either Medical Defendant.  On September 24, 2013, Lomax was examined by Flury, but again refused to allow the PA to perform an I & D.  Flury did take a culture of the wound and the results showed that Lomax was on the appropriate broad spectrum antibiotic.  ECF No. 47-A, pgs. 28-29, 86-97, 99-101; 47-B, Flury Aff.

Lomax continued to receive wound care from various nurses through October 2, 2013.  The Medical Defendants maintain that by October 2, 2013, Lomax no longer had any open areas on his hand that required wound care and he declined to have a dressing applied to his hand.  This was the last treatment Flury provided to Lomax as his employment with the healthcare contractor ended on October 2, 2013.  ECF No. 47-A, pgs. 103-04 & 108-13.

---

[8]     Ciprofloxacin or Cipro is used to treat bacterial infections in many different parts of the body.  *See*   http://www.mayoclinic.org/drugs-supplements/ciprofloxacin-oral-route/description/drg-20072288.

On October 19, 2013, Lomax was examined by Nurse Morgan, who noted that Lomax had finished his antibiotics.  Lomax informed Morgan that he had no pain or discomfort to his left hand, but could not move his pointer finger.  ECF No. 47-A, pg. 114.  On October 23, 2013, Lomax received additional x-rays which showed that he had a "focal bony erosion along distal end of first metacarpal bone with loss of joint space at metacarphalangeal joint," a new development from his prior August 22, 2013 x-ray.  It was noted that the change in the x-ray was likely secondary to trauma or infection.  ECF No. 47-A, pg. 116.

On December 19, 2013, Lomax was seen by Dr. Ottey and indicated he remained unable to move his left index finger.  Ottey ordered an additional x-ray which showed that there was no evidence of an acute fracture, dislocation or subluxation.  On January 4, 2014, Ottey noted that Lomax continued to have a decreased range of motion ("ROM") in his left index finger and that he had been performing hand exercises without improvement.  On January 24, 2014, Lomax was seen by Nurse Swan and complained about his inability to bend his finger.  Swan noted that Lomax's finger could be passively flexed, but could not be completely flexed.  On March 5, 2014, Lomax was seen for his gastroenterology and urology complaints and claims spinal discomfort and a loss of ROM in his finger.  ECF No. 47-A, pgs. 21, 124-34. 138-39; 47-C, Ottey Aff.

Lomax next complained about his decreased ROM to his index finger on August 1, 2014, and was seen by Nurse Practitioner Clark, who noted that Lomax could not move the proximal joint of his left index finger.  The records show that during this time period Lomax was prescribed and received Ibuprofen and Naproxen for pain.  Clark ordered another x-ray, which indicated a bony fusion at the second metacarpal-phalangeal joint.  Clark discussed the results of

11

the x-rays with Lomax on August 14, 2014.   On August 28, 2014, Clark contacted the
Occupational Therapy Department at a local college in an attempt to obtain self-management
handouts for Lomax.   Clark later sought to obtain an occupational therapy consultation for
Lomax after her attempts to obtain "problem-specific" occupational therapy exercises were
unsuccessful.  ECF No. 47-A, pgs. 148-57, 160-65, 173, 185, 189, 191, 193 & 196-99.

On September 25, 2014, Lomax began receiving physical therapy with Physical Therapist
("PT") Ryan, who noted that the goal was to restore the ROM to Lomax's left index finger and
to establish a self-management program for Lomax to follow.   ECF No. 47-A, pgs. 201-02 &
204-07.  By the end of October 2014, Lomax had completed therapy, with no improvement to his
ROM of his left index finger.   ECF No. 47-A, pgs. 212-14.   Dr. Ottey conducted a periodic
physical exam on December 11, 2014, and noted that Lomax had contraction of the second left
"MCP."[9]   ECF No. 47-A, pgs.   229-33. The  healthcare  provider  decided  that  additional
conservative  treatment  was  appropriate,  but  upon  a  request  from  Nurse  Swan,  Lomax  was
referred to Orthopedic Specialist Dr. Carls.  ECF No. 47-A, pgs. 225-28 & 241-42.  Lomax was
seen by Carls on January 2, 2015.  Carls noted that Lomax had good motion across his proximal
and distal inner phalangeal joints, but had no appreciable motion across his left index metacarpal
phalangeal joint.  He found that there was very little likelihood that Lomax would get motion
back  to  his  index  finger,  even  with  a  surgical  resection  of  the  bone  and  a  silicon  joint
replacement.  ECF No. 47-A, pg. 243.  He concluded that the finger fusion was the result of
trauma or infection to the joint.  Carls noted that the left hand was Lomax's non-dominant hand
and that although it was "less pressing" to discuss the surgical option, he would recommend

---

[9]       MCP is an abbreviation for metacarpophalangeal.  *See* Medical Dictionary for Health
Professions and Nursing 2012.  Metacarpophalangeal pertains to the metacarpus and phalanges of the
fingers.  *See* http://medical-dictionary.thefreedictionary.com/metacarpophalangeal.

Lomax see a hand surgeon to discuss the possibility.  *Id*.  Although Carls found it unlikely that Lomax would get the motion back in his finger, Dr. Ottey has decided to arrange a consultation with a hand surgeon.  ECF No. 47-C, Ottey Aff.  The healthcare provider is coordinating off-site care for Lomax to be examined by a hand surgeon.

In his opposition Lomax complains that Flury and Ottey violated his constitutional rights and genuine facts remain in dispute.  ECF No. 50.  He claims that the attachments to his complaint show that he did not refuse to submit to Flury's method of "express drainage," and he disputes the Medical Defendants' claims that he received pain medication and first aid supplies over a forty-eight hour period, along with several antibiotic shots.  He takes issue with Dr. Ottey for not referring him to an orthopedic surgeon, even though the physician said he would schedule him to see one.  Lomax claims that Ottey was aware that no amount of physical therapy or exercises would permit him ever to bend his finger again without surgery.  He maintains that only with the filing of this litigation is he now receiving the "service" he requires, but that this "does not cure the constitutional violations of Defendants' actions and inactions…"  ECF No. 50.

The medical record speaks for itself.  The evidence presented taken in the light most favorable to Plaintiff establishes that medical providers did not recklessly refuse to assess and treat Lomax's condition.  His disagreement with the conservative treatment he received for his hand injury, *i.e.* wound care, antibiotics, pain medication, x-rays, diagnostic testing to determine if he was infected with a sexually transmitted disease ("STI"), and physical therapy is not a basis for an Eighth Amendment claim.  Further, Lomax acknowledges that he would not permit Flury to perform an I & D to remove prurient material from an abscess on his left hand by the method Flury deemed appropriate.

Defendants Ottey and Flury are entitled to summary judgment in their favor; however, in granting summary judgment the court in no way implies that Lomax is not entitled to medical treatment for his condition.  That right to treatment "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable.*"  *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir.1977).  The record evidence indicates that Lomax's requests were considered, his needs were addressed, and he was encouraged by medical staff to keep them informed of any serious symptoms.

The fact that Lomax's requests to see an orthopedic surgeon were not initially approved simply does not reflect deliberate indifference on the part of Ottey and Flury.  He was repeatedly seen by prison nurses, PAs and physicians for hand treatment.  Any delays that occurred were medically-based decisions.  Lomax's grievances with the medical decisions made regarding what tests and treatments are necessary in light of the symptoms presented are reflective of his frustration, but  "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a §1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985), citing *Gittlemacker v. Prasse,* 428 F.2d 1, 6 (3rd Cir. 1970).  There are no exceptional circumstances alleged in this case.

**Defendants Bishop, Shearin and Roderick (State Defendants)**

The State Defendants assert that Lomax's claims filed against them are dismissible under Rule 12(b)(6) and Rule 56 on grounds of failure to exhaust administrative remedies, lack of personal participation, *respondeat superior*, the failure to demonstrate a violation of the Eighth Amendment, and qualified immunity.

14

I.      **Failure to Exhaust**

Defendants argue that Lomax's claim is barred due to his failure to exhaust administrative remedies as they assert that he failed properly to pursue his claims to all levels of remedy review.  Title 42 U.S.C. § 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  Proper exhaustion of administrative remedies demands compliance with an agency's deadlines and other critical procedural rules because "no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings."  *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006).  Administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner.  Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendant(s).  *See Jones v. Bock*, 549 U.S. 199, 215-216 (2007); *Anderson v. XYZ Correctional Health Services, Inc.*, 407 F.2d 674, 682 (4th Cir. 2005).

Lomax's claim falls under the exhaustion prerequisites of § 1997e(a), and must be dismissed unless he can show that he has satisfied the administrative exhaustion requirement or that Defendants have forfeited their right to raise non-exhaustion as a defense.  *See Chase v. Peay*, 286 F.Supp.2d 523, 528 (D. Md. 2003).  In Maryland, filing a request for administrative remedy with the Warden of the prison in which one is incarcerated is the first of three steps in

the Administrative Remedy Procedure ("ARP") process provided by the Division of Correction.

If this request is denied, the prisoner has thirty calendar days to file an appeal with the

Commissioner of Correction.  If an appeal is denied, the prisoner has thirty days in which to file

an appeal to the Executive Director of the Inmate Grievance Office ("IGO").  *See* Md. Code

Ann. Corr. Serv. §§ 10–206, 10–210; Md. Regs. Code Title 12 § 07.01.03.

Administrative remedies must, however, be available to the prisoner and this court is

"obligated to ensure that any defects in administrative exhaustion were not procured from the

action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th

Cir. 2007).  The Fourth Circuit has addressed the meaning of "available" remedies:

> [A]n administrative remedy is not considered to have been available if a prisoner,
> through no fault of his own, was prevented from availing himself of it.  *See
> Aquilar-Avellaveda v. Terrell*, 478 F. 3d 1223, 1225 (10th Cir. 2007); *Kaba v.
> Stepp*, 458 F. 3d 678, 684 (7th Cir. 2006).  Conversely, a prisoner does not
> exhaust all available remedies simply by failing to follow the required steps so
> that remedies that once were available to him no longer are.  *See Woodford v.
> Ngo*, 548 U.S. 81, 89 (2006).  Rather, to be entitled to bring suit in federal court, a
> prisoner must have utilized all available remedies "in accordance with the
> applicable procedural rules," so that prison officials have been given an
> opportunity to address the claims administratively. *Id*. at 87.  Having done that, a
> prisoner has exhausted his available remedies, even if prison employees do not
> respond.  *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

*Moore v. Bennette*, 517 F. 3d 717, 725 (4th Cir. 2008); *see also Blake v. Ross*, 787 F.3d 693,

700-01 (4th Cir. 2015) (inmate's belief that he exhausted administrative remedies was a

reasonable interpretation of investigative and grievance procedures).

The State Defendants argue that although Lomax filed ten ARPs about the injury

sustained to his hand,[10] he did not raise an allegation against a correctional Defendant concerning

the issue.  ECF No. 33-2.  They further affirm, through the Executive Director of the Inmate

---

[10]    *See* NBCI-2603-13, NBCI-2609-13, NBCI-2620-13, NBCI-2621-13, NBCI-2622-13, NBCI-2964-13, NBCI-2984-13, NBCI-3017-13, NBCI-0318-14 & NBCI-2514-14.

Grievance Office ("IGO") that Lomax has not filed a grievance with the IGO since 2011.  ECF No. 33-3, Oakley Decl.

Lomax claims that the State Defendants cannot raise the exhaustion defense because in Maryland the ARP process is an unavailable remedy.  He claims that he "did everything…to exhaust his administrative remedies at every level…," including writing to the IGO and he did not receive a response.  ECF No. 41.

The record shows that the ARP grievance process was available to Lomax and he used the process on numerous occasions.  The failure fully to exhaust administrative remedies is argued and disputed by Lomax.  Officially, he clearly did not fully grieve claims regarding his injury and treatment.  He affirms, however, that he filed appeals to the IGO, but the appeals were not responded to by the IGO.  Even if exhaustion requirements were found to be met and the court were to look at the merits of Lomax's claims, there are no constitutional violations stated against the named State Defendants.

## II.      Respondeat Superior

It is well established that the doctrine of respondeat superior does not apply in § 1983 claims.  *See Monell v. New York City Department of Social Services*, 436 U.S. 658, 694 (1978); *Love–Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983).  Under § 1983, individual liability must be based on personal conduct.  *See Wright v. Collins,* 766 F.2d 841, 850 (4th Cir. 1985); *see also Foote v. Spiegal,* 118 F.3d 1416, 1423 (10th Cir. 1997).  Further, absent subjective knowledge, a prison official is not liable.  *Farmer v. Brennan,* 511 U.S. 825, 847 (1994); *see Johnson v. Quinones,* 145 F.3d 164, 168 (4th Cir. 1998).

In addition, Defendants Shearin and Bishop may not be held liable under a theory of *respondeat superior.* Under *Shaw v. Stroud,* 13 F.3d 791 (4th Cir. 1994), supervisory liability may attach under § 1983 if a plaintiff can establish three elements. These are: (1) "that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff"; (2) "that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices'";[11] and (3) "that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Id.* at 799 (citations omitted).

Further, § 1983 liability on the part of supervisory defendants requires a showing that: "(1) the supervisory defendants failed promptly to provide an inmate with needed medical care, (2) that the supervisory defendants deliberately interfered with the prison doctors' performance, or (3) that the supervisory defendants tacitly authorized or were indifferent to the prison physicians' constitutional violations." *Miltier v. Beorn*, 896 F. 2d 848, 854 (4th Cir. 1990) (internal citations omitted). There is no allegation or showing demonstrating the State Defendants' supervisory liability with regard to the alleged denial of medical care. *See Shaw*, 13 F.3d at 799; *Miltier v. Beorn*, 896 F. 2d 848, 854 (4th Cir. 1990). There is no evidence that Bishop, Shearin, and Roderick had actual or constructive knowledge that medical staff were ignoring Lomax's complaints regarding his hand and that the denial of care posed "a pervasive

---

[11]     Further, in establishing "deliberate indifference" under this second prong, a plaintiff "[o]rdinarily…cannot satisfy his burden of proof by pointing to a single incident or isolated incidents ... for a supervisor cannot be expected ... to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct." *Slakan v. Porter,* 737 F.2d 368, 373 (4th Cir. 1984). Deliberate indifference, however, may be satisfied by showing "[a] supervisor's continued inaction in the face of documented widespread abuses." *Id.*

and unreasonable risk" of constitutional injury to Lomax.  Plainly they are entitled to rely on the medical expertise of trained health care professionals and the mere fact that Lomax's ARPs were found to be without merit does not evidence that they tacitly authorized unconstitutional behavior in regard to Lomax's medical treatment.  The liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'  *Bayard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001), citing *Slaking v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984).  Lomax's claim with regard to former Warden Shearin, Warden Bishop and Correctional Case Management Manager Roderick is based on their supervisory positions as wardens and managers at NBCI, as they do not appear to have been personally involved in the matter at issue.[12]  There is no evidence to suggest that they had actual or constructive knowledge of the matter at issue here.[13]

---

[12]     In his Declaration, Defendant Bishop affirms that he is not trained as a health care provider and has no authority to dictate the type of medical treatment an inmate is to receive.  He maintains that in the Maryland prison system, medical care for inmates is provided by private health care contractors.  ECF No. 33-1, Bishop Decl.

[13]     Defendant Roderick claims that Lomax has failed to set forth any allegations indicating how Roderick violated his rights and the Complaint against him should be dismissed.  The court observes that Lomax named Roderick in his Complaint solely in regard to the manner of Roderick's response to his ARP.  Lomax's dispute with how his ARPs were handled does not, however, set out a colorable claim.  Under the law in this Circuit, the Constitution creates no entitlement to grievance procedures or access to such procedures voluntarily established by a state.  *See Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994).

**CONCLUSION**

Having found no genuine dispute of material fact justifying a trial on the merits in this case, Defendants' dispositive Motions, converted to motions for summary judgment, shall be granted.[14]   A separate Order shall be entered forthwith.


Date:  August 4, 2015                                            _____/s/_____

                                                                                DEBORAH K. CHASANOW
                                                                                United States District Judge

---

[14]            In light of the absence of an Eighth Amendment deprivation, the court sees no need to address Defendants' qualified immunity arguments.